United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| POSTX CORPORATION,<br><br>　　　Plaintiff,<br>　v.<br><br>SECURE DATA IN MOTION, INC.,<br>d/b/a SIGABA, et al.,<br><br>　　　Defendants.<br>_____/<br>AND RELATED COUNTERCLAIMS.<br>_____/ | No. C 02-04483 SI<br><br>**ORDER GRANTING PLAINTIFF'S AND COUNTERDEFENDANTS' MOTION FOR SUMMARY ADJUDICATION OF ANTITRUST CONSPIRACY CLAIMS** |

On April 22, 2005, the Court heard oral argument on counterdefendants PostX and Mayfield's motion for summary adjudication of Sigaba's first, third, and fifth counterclaims. Having carefully considered the arguments of counsel and the papers submitted, the Court hereby GRANTS the motion for the reasons set forth below.

## BACKGROUND

On September 13, 2002, PostX Corporation ("PostX") filed a complaint for patent infringement against Secure Data In Motion, d/b/a Sigaba ("Sigaba"). On September 29, 2003 and November 25, 2003, the Court granted Sigaba's motions for summary judgment of non-infringement of United States Patent No. 6,477,647 ("the '647 Patent") and U.S. Patent No. 6,014,688 (" the '688 patent"). The Federal Circuit affirmed without opinion on November 15, 2004. On February 4, 2004, the Court granted summary judgment for defendants on PostX's claim for misappropriation of trade secrets under the Uniform Trade Secrets Act ("UTSA") because of PostX's failure to adequately disclose the trade secrets at issue in that claim. This left for resolution

defendant's three antitrust counterclaims and one false advertising counterclaim.

In its counterclaims, Sigaba alleges that PostX initiated the patent suit against it for improper and anticompetitive purposes. Sigaba's Answer and Counterclaims ¶ 20. In August 2000, officers of both companies met to explore business opportunities and entered into a Non-Disclosure Agreement. Id. at ¶ 14. After these discussions ended, PostX and Sigaba remained competitors in the market for "non-PKI-based Secure Document Delivery Systems," particularly for the business of Bank of America. Id. at ¶ 10, 16. On about August 28, 2002, Bank of America signed a contract to purchase Sigaba's secure document delivery system. Id. at ¶ 16.

According to the counterclaims, PostX learned that it had lost the Bank of America contract to Sigaba and, on September 12, 2002, sent a fax to Bank of America informing the bank that it had filed a patent infringement suit against Sigaba, and posted a press release on its website announcing the filing of its suit. Id. at ¶ 18-19. PostX did not actually file the patent infringement suit until September 13, 2002. Id. at ¶ 19. Sigaba alleges that, because of the 2000 meeting between the companies, PostX knew that Sigaba's products did not infringe the '688 patent, and in fact PostX's Chief Technology Officer admitted that the suit had no technical merit. Id. at ¶ 21-22. After a second patent, the '647 patent, was issued to PostX in November 2002, PostX filed a second patent infringement suit against Sigaba, which Sigaba also claims is sham litigation. Id. at ¶ 23. According to Sigaba's counterclaims, PostX conspired with counterdefendant the Mayfield Funds ("Mayfield" or "the Mayfield Funds") and attempted to monopolize the market for "non-PKI-based Secure Document Delivery Systems." Id. at ¶¶ 10-11.

The Mayfield Funds are the investment vehicles for a venture capital firm that invested in PostX multiple times since 1998 and has owned approximately 20% of PostX's stock during this time. Decl. of Yogen Dalal ("Dalal Decl.") at ¶ 4. Mayfield has the right to appoint a director of PostX, and Mayfield managing director Yogen Dalal served on PostX's board from November 1998 to September 2002. PostX and Mayfield also entered into a Management Rights Agreement ("MRA") which gave Mayfield the right, among others, to: "consult with and advise management of PostX on significant business issues, including management's proposed annual and quarterly operating plans," and stated that "if [Mayfield] is not represented on PostX's Board of Directors, PostX shall invite a representative of [Mayfield] to attend all meetings of its Board of Directors in

a non-voting observer capacity . . . [who] may participate in discussions of matters brought to the Board provided that the representative will recuse himself or herself from discussions that involve conflict of interest between PostX and Mayfield." Dalal Decl., Ex. A at PXT 0089751. According to Sigaba, this MRA granted unique rights to Mayfield that exceeded those guaranteed other PostX investors. Def.'s Opp'n at 2:22-24.

According to PostX, Dr. Dalal took a sabbatical from late June through September 2002. Dalal Decl. ¶ 8; Decl. of Allen Morgan ("Morgan Decl.") ¶ 8. Allen Morgan, a managing director of Mayfield, had been attending PostX board meetings as a non-voting observer during the late spring and summer of 2002. Before Dalal's departure, Sigaba alleges that Dalal led the PostX board in its decision to fire the current CEO and replace him with Thampy Thomas in June 2002. Def.'s Opp'n at 4:19;5:3. Thomas developed a "counteroffensive" strategy to win the Bank of America business, which included the patent lawsuit. According to Sigaba, PostX sought the "agreement, approval and backing of Mayfield" to initiate the lawsuit by involving Allen Morgan in the decision-making process. Specifically, Thomas, Morgan, and PostX CTO Cayce Ullman held a one-hour conference call on September 12, 2002, during which they reached agreement that PostX would file the sham suit. Decl. of John L. Cooper, Ex. P (Thomas Depo.) at 335:20-336:18. No other PostX board members participated in this call. Id. at 304:1-9.

Then, on September 13, 2002, at 9:00 a.m., the PostX board voted to (1) remove Dalal as the Mayfield representative on the PostX board and appoint Mr. Morgan as a PostX director, and (2) approve the filing of the lawsuit. Cooper Decl., Ex. CC at PXT 0087030. The PostX board made Morgan's appointment effective September 11, 2002 by a resolution stating "[t]hat all actions taken by Allen Morgan from and after September 11, 2002, and his participation in all deliberations of the Board from and after that date, are hereby ratified, approved and confirmed as taken in his capacity as a member of the Board." Id. at 0087029. Morgan states that he attended the board meetings prior to September 13, 2002 as a non-voting observer, and became a director of PostX on September 11, 2002, "for the purpose of casting a vote at the September 13, 2002 PostX Board meeting." Morgan Decl. ¶ 8. When Dr. Dalal returned from sabbatical at the beginning of October 2002, he replaced Morgan as a director of PostX. Id. at ¶ 11.

Sigaba alleges that this conduct by PostX and Mayfield reveals their anticompetitive objectives in filing the sham litigation. In addition, it contends that Mayfield materially contributed to the anticompetitive conduct

3

"pledg[ing] continuing support" to PostX and thereby helping to finance the litigation. Cooper Decl., Ex. G (Dean Mayer Depo.) at 428:20-22. Mayfield provided $1 million in PostX's December 2002 round of financing and $1.5 million in an August 2003 financing for PostX's operating expenses, which would include the litigation expenses for the Sigaba suit. Id., Ex. A (Dalal Depo.) at 274:15-275:8.

Now before the Court is a motion by PostX and the Mayfield Funds for summary adjudication of three of defendant's counterclaims: (1) for "restraint of trade" under Section 1 of the Sherman Act; (2) for "conspiracy to attempt monopolization" under Section 2 of the Sherman Act; and (3) for declaratory relief as to these claims.

## LEGAL STANDARD

Summary judgment or adjudication is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

In a motion for summary judgment, "[if] the moving party for summary judgment meets its initial burden of identifying for the court those portions of the materials on file that it believes demonstrate the absence of any genuine issues of material fact, the burden of production then shifts so that the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial." See T.W. Elec. Service, Inc., v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 ( 9th Cir. 1987) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 317 (1986)). In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence, and draws all inferences in the light most favorable to the non-moving party. See T.W. Electric, 809 F.2d at 630-31 (citing Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348 (1986)); Ting v. United States, 927 F.2d 1504, 1509 (9th Cir. 1991). The evidence presented by the parties must be admissible. Fed. R. Civ. P. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. Thornhill Publ'g Co., Inc. v. GTE Corp., 594 F.2d 730, 738 (9th Cir. 1979).

4

**DISCUSSION**

PostX and Mayfield bring this motion for summary adjudication of Sigaba's first and third counterclaims, which allege a conspiracy to violate §§ 1 and 2 of the Sherman Act, and the fifth counterclaim, which seeks declaratory relief. The gravamen of Sigaba's allegations is that PostX's patent suit constituted sham litigation prosecuted for an anticompetitive purpose, and that Mayfield and PostX together conspired to initiate and finance the suit. PostX and Mayfield contend that these counterclaims must be dismissed because, under the "intracorporate conspiracy doctrine," PostX and Mayfield were legally incapable of an antitrust conspiracy because Mayfield's nominees to the PostX board do not have an independent personal stake in the antitrust violation and because Mayfield does not compete with PostX in the relevant market.

**A.  Application of the intracorporate conspiracy doctrine**

Under the intracorporate conspiracy doctrine, certain actors who "operate within and for the benefit of a single economic enterprise" do not meet the "concerted action" requirement of Section 1 of the Sherman Act. Podiatrist Ass'n, Inc. v. La Cruz Azul de Puerto Rico, Inc., 332 F.3d 6, 13 (1st Cir. 2003).[1] The doctrine precludes antitrust claims where the officers or employees of a company are alleged to have conspired with the corporation. See Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 769 (1984) ("officers of a single firm are not separate economic actors pursuing separate economic interests, so agreements among them do not bring together economic power that was previously pursuing divergent goals"). The doctrine also applies generally to the "internally coordinated conduct of a corporation and one of its unincorporated divisions." Id. at 770. In Copperweld, the Supreme Court extended this doctrine to a claim that a corporation conspired with its wholly-owned subsidiary. Id. at 771. Many courts have recognized an exception for "corporate officers acting on their own behalf," see Copperweld, 476 U.S. at 770 n. 15, which applies when an officer has "an independent personal stake in achieving the corporation's illegal objective." Greenville Publ'g Co. v. Daily Reflector, Inc., 496 F.2d 1391, 1399 (4th Cir. 1974).

In two recent decisions, the Ninth Circuit has clarified the general principles to guide the inquiry when

---

[1] According to PostX, the concerted action requirement for Section 1 claims also applies to Section 2 claims of conspiracy to monopolize.

5

separate entities with a common economic interest are alleged to have conspired. In Freeman v. San Diego Ass'n of Realtors, 322 F.3d 1133, 1148-49 (9th Cir.), cert. denied, 540 U.S. 940 (2003), the Court of Appeals stated:

> Although the single-entity inquiry is fact-specific, a few general guidelines emerge. First, in the absence of economic unity, the fact that joint venturers pursue the common interests of the whole is generally not enough, by itself, to render them a single entity . . . Second, in the absence of economic unity, the fact that firms are not actual competitors is also usually not enough, by itself, to render them a single entity. Absence of actual competition may simply be a manifestation of the anticompetitive agreement itself . . . Cases have required instead that the constituent entities be neither actual nor *potential* competitors. Finally, where firms are not an economic unit and are at least potential competitors, they are usually not a single entity for antitrust purposes.

322 F.3d at 1148-49 (italics in original).

Since Freeman, the Ninth Circuit has reaffirmed these general principles and held that "[t]he crucial question is whether the entities alleged to have conspired maintain an 'economic unity,' and whether the entities were either actual or potential competitors. Our inquiry is a functional one." Jack Russell Terrier Network of Northern Cal. v. Amer. Kennel Club, Inc., 407 F.3d 1027, 1034 (9th Cir. 2005), citing Freeman, 322 F.3d at 1148-49, and Copperweld, 467 U.S. at 773 n.21 ("substance, not form, should determine whether a separately incorporated entity is capable of conspiring under § 1").[2]

Sigaba cites several cases for the propositions that (1) entities may share one aligned economic interest but not be entitled to single entity status, and (2) there need not be any competitive relationship between the conspiring parties for a conspiracy to exist. See Minpeco, S.A. v. ContiCommodity Services, Inc., 673 F. Supp. 684 (S.D.N.Y. 1987) (finding conspiracy between investors and silver traders, despite their aligned interest in the restraint of trade); Pinhas v. Summit Health Ltd., 894 F.2d 1024 (9th Cir. 1989) (finding no immunity from conspiracy for an attorney and client allegedly engaging in anticompetitive behavior); Agron, Inc. v. Chien-Lu Lin, 2004 WL 555377 (C.D. Cal. March 16, 2004) (applying Pinhas and finding a cognizable conspiracy claim against a lawyer and patent holder who agreed to bring baseless patent suits). According to Sigaba, the question of actual or potential competition is "*not the only method* to determine whether the entities economic interests are diverse," see Def.s' June 3, 2005 Letter Br. at 2 (italics in original), citing City

---

[2] The parties have briefed the significance of the Jack Russell decision in letter briefs to the Court filed since the hearing.

of Mt. Pleasant v. Associated Elec. Coop., Inc., 838 F.2d 268, 276 (8th Cir. 1988) ("By 'diverse,' we mean interests which tend to show that any two of the defendants are, or have been, actual or potential competitors, or, at the very least, interests which are sufficiently divergent so that a reasonable juror could conclude that the entities have not always worked together for a common cause.").

While in some contexts, courts have apparently recognized antitrust conspiracies among individuals or entities without a competitive relationship, like lawyers and their clients, the Court finds that the general principles enunciated in Freeman and Jack Russell apply in this case, where the alleged conspiracy is between two economic actors with independent – though not necessarily diverse – economic interests. Copperweld teaches that the fundamental issue is whether the entities are "separate economic actors pursuing separate economic interests [such that] agreements among them . . . suddenly bring together economic power that was previously pursuing divergent goals." In the context of an investor and an investee like PostX and Mayfield, the appropriate inquiry is whether the two maintain an economic unity and whether they are actual or potential competitors.

**B.  Economic unity and competition between PostX and Mayfield**

In conducting the fact-specific inquiry under the principles of Freeman and Jack Russell, the Court considers whether PostX and Mayfield possessed economic unity at the time of their agreement and whether they are actual or even potential competitors.

Mayfield was the most important PostX investor, holding 20% of its shares, and had significant access to and influence over PostX, including a Management Rights Agreement that was favorable to Mayfield. While Sigaba suggests that this level of access and involvement was somehow illicit, it is difficult to see how such substantial influence would make the two entities more capable of conspiring rather than less. See Fresh Made, Inc. v. Lifeway Foods, Inc., 2002 WL 31246922 at *7 (E.D. Pa. Aug. 9, 2002). At the same time, PostX and Sigaba are separate economic entities, and of course they do not have identical economic interests in all circumstances. Nonetheless, their interests in PostX's success were one and the same, and the Court cannot conceive of how Mayfield's interest in obtaining a favorable return on its investment in PostX constitutes a

7

"separate" interest from that of PostX's other shareholders or of PostX itself.[3] The aligned interest of PostX and Mayfield in PostX's success is not the "commonality of interest" that "exists in every cartel," <u>L.A. Memorial Coliseum Comm'n v. N.F.L.</u>, 726 F.2d 1381, 1389 (9th Cir. 1984), but rather the unity of economic interest shared between any shareholder and the company in which it invests. Sigaba's only concrete suggestion of how those interests might diverge is that Dr. Dalal emailed the PostX board on May 16, 2002, suggesting a possible merger of PostX with another company:

> I have been thinking about what the future holds for PostX and I don't feel good . . . Mayfield has a lot invested and I can't watch it get wasted without doing all I can to make this investment return something for us . . . We must consolidate or we will find ourselves with no cash at the end of the year and then its lights out. Mike has been unsuccessful in raising any money and it's not surprising why – no revenues and high valuation at PostX! I suggest we cut the company back and merge it with Boldfish ASAP . . . I had a long chat with John Shoch today and he is supportive as both Mayfield and Alloy have a lot of money in both companies and we need to get some returns now . . . We need to salvage all our work quickly.

Cooper Decl., Ex. O (Dalal Depo.), Depo. Ex. 1034.

Sigaba argues that this email is proof that Mayfield sought return on its investment regardless of the consequences for PostX. But, as Thampy Thomas testified, that merger never occurred because the PostX board, including Dalal, and together with Thomas, "decided against it." Cooper Decl., Ex. P (Thomas Depo.) at 848:18. As PostX points out, Dalal's suggestion does not so much reflect an interest diverse from PostX's as the interest in maximizing PostX's shareholder value. In addition, while Sigaba suggests that Mayfield was the animating force behind the strategy to eliminate competition from Sigaba, it is clear that PostX's "counteroffensive" plan to defeat Sigaba was initiated by PostX CEO Thampy Thomas.

Rather than indicating divergent or potentially competing interests coming together for a single anticompetitive objective, these facts weigh in favor of a finding that PostX and Mayfield shared a common interest in PostX's financial success before the decision to file the patent suit. In addition, there is no evidence that they were or might be competitors previously pursuing separate interests "sudden[ly] joining economic power." <u>Copperweld</u>, 467 U.S. at 771. Rather, at all times, the two entities and their representatives were

---

[3] According to Dr. Dalal's deposition, Mayfield would now no longer be considered the "lead investor" in PostX (which is the term for an investor that provides the largest dollar amount and sets the terms of the company's financings), because another firm led the investment and set the terms of the most recent financing, and that firm now owns the same percentage of PostX as Mayfield. Cooper Decl., Ex. O (Dalal Depo.) at 23:8-24:15.

engaged in corporate governance decisions regarding PostX, a company in which they have shared an economic interest since 1998. Accordingly, they are entitled to the protection of the intracorporate conspiracy doctrine.

### C.   Morgan's director status

Because the Court finds that PostX and Mayfield were legally incapable of an antitrust conspiracy, the matter of Allen Morgan's precise status on September 12, 2002 is not dispositive of this motion. Sigaba contends that Allen Morgan was not a board member at the time of his September 12, 2002 conversation with Thampy Thomas, during which they agreed that PostX should file suit. Sigaba characterizes the board's retroactive appointment of Morgan as "backdating" his directorship precisely to avoid liability for conspiracy, and it argues that Morgan was acting on Mayfield's behalf, not PostX's, at the time of the allegedly conspiratorial agreement. In addition, Sigaba contends that Morgan was capable of conspiring with PostX even when he was a director, because Mayfield had independent economic interests which Morgan was protecting.

PostX contends that this issue is a red herring, because Thomas could consult with Morgan under the terms of the Management Rights Agreement between PostX and Mayfield both before and after his appointment to the board, and the board's retroactive ratification of Morgan as a director was entirely effective under California law. In addition, PostX and Mayfield apparently seek a broader holding from the Court that corporate directors and the minority shareholders who appoint them are legally incapable of conspiring with the corporation in which the shareholder invests.

As PostX points out, counterdefendants do not dispute that Mayfield's representative on the PostX board, Allen Morgan, participated in and supported the decision to sue Sigaba. The Court agrees that the application of the intracorporate conspiracy doctrine rests on the above analysis of PostX and Mayfield's corporate relationships, not "on dispute issues of who knew what when, or who said what to whom." Pls.' Reply at 2:18-19. Both parties correctly recognize that, regardless of Morgan's director status on September 12, 2002, the intracorporate conspiracy doctrine looks to economic reality, not corporate form. Copperweld, 467 U.S. at 772; City of Mt. Pleasant, supra, 838 F.2d at 275. Viewing the evidence in the light most

favorable to Sigaba, the Court declines to hold that Allen Morgan's director status itself on September 12, 2002, makes PostX and Mayfield legally incapable of antitrust conspiracy.

However, the Court also declines to adopt a broader holding that would suggest that a corporate director and the shareholder he or she represents are always shielded under the intracorporate conspiracy doctrine. Under the circumstances of this case, and on the record before the Court, Mayfield and PostX enjoyed an economic unity, were neither actual nor potential competitors, and were legally incapable of the alleged conspiracy. Sigaba has not established a triable issue of fact on any of these issues.

### D. Objections to evidence

PostX has filed a series of objections to statements in Sigaba's Opposition brief and evidence submitted. The Court finds that, even assuming all statements and evidence are admissible, Sigaba has not established that a triable issue of material fact exists to defeat summary judgment. Accordingly, it does not rule on PostX's objections individually.

### CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby GRANTS PostX and Mayfield's motion for summary adjudication of Sigaba's antitrust counterclaims. [Docket # 509].

**IT IS SO ORDERED.**

Dated: August 16, 2005

SUSAN ILLSTON
United States District Judge

10