1

2

3

4

5 IN THE UNITED STATES DISTRICT COURT

6 FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8 POSTX CORPORATION,                          No. C 02-04483 SI
                                             (Related Case No. 03-0521)
9              Plaintiff,
                                             **ORDER RE: SUMMARY ADJUDICATION**
10    v.                                     **MOTIONS**

11 SECURE DATA IN MOTION, d/b/a SIGABA,

12             Defendant,
   _____/
13
   AND RELATED COUNTERCLAIMS.
14
   _____/
15

16        On April 22 and July 15, 2005, the Court heard oral argument on the parties' various motions for

17 summary adjudication.  In a separate order the Court has addressed PostX's motion for summary adjudication

18 of Sigaba's "antitrust conspiracy" counterclaims (Counts I, III, and V); this order deals with the balance of the

19 motions.

20        Having carefully considered the arguments of counsel and the papers submitted, the Court hereby

21 ORDERS as follows: Sigaba's motion for summary adjudication of PostX's common law unfair competition

22 claim is DENIED.  PostX's motion for summary adjudication based on Noerr-Pennington immunity is

23 GRANTED as to Sigaba's antitrust counterclaims (Counts I, II and III) and DENIED as to Count IV, the

24 Lanham Act counterclaim.  PostX's remaining motions for summary adjudication of Counts I, II, and III are

25 DENIED as moot.  PostX's motion for summary adjudication of Sigba's Counts IV and VI, the Lanham Act

26 and common law unfair competition counterclaims, is DENIED.

27

28

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

**BACKGROUND**

On September 13, 2002, PostX Corporation ("PostX") filed a complaint for patent infringement against Secure Data In Motion, d/b/a Sigaba ("Sigaba"), alleging infringement of U.S. Patent No. 6,014,688 ("the '688 patent"). In February 2003, after the U.S. Patent Office issued United States Patent No. 6,477,647 ("the '647 Patent") to PostX, PostX filed a second infringement suit against Sigaba. On September 29, 2003, and November 25, 2003, the Court granted Sigaba's motions for summary judgment of non-infringement of both patents. The Federal Circuit affirmed without opinion on November 15, 2004. On February 4, 2004, the Court granted summary judgment for defendants on PostX's claim for misappropriation of trade secrets under the Uniform Trade Secrets Act ("UTSA") because of PostX's failure to adequately disclose the trade secrets at issue in that claim.

On June 28, 2004, this Court granted PostX leave to file a Third Amended Complaint, amending a claim for breach of confidentiality agreement by former PostX and current Sigaba employee James Reid ("Reid"), and adding a claim for common law unfair competition. See June 28, 2004 Order at 1-2. Sigaba and Reid filed counterclaims against PostX for violations of the Sherman Act and false advertising under the Lanham Act.[1] On November 22, 2004, the Court denied a motion by Sigaba to dismiss PostX's unfair competition claim. The remaining claims in the case are: PostX's claim for common law unfair competition; Sigaba's Sherman Act counterclaims for conspiracy to restrain trade under Section 1 (Count I), attempted monopolization under Section 2 (Count II), and conspiracy to attempt monopolization under Section 2 (Count III);[2] Sigaba's counterclaim under Section 43(a) of the Lanham Act; and Sigaba's counterclaim for common law unfair competition.

For its unfair competition claim, PostX alleges that James Reid sent Sigaba employee Stanley Chin an email on June 11, 2002, containing "a list of customers and potential customers with whom he had interacted while employed by PostX," and Chin passed this email along to Sigaba's President and Chief Operating Officer

---

[1] On August 22, 2004, PostX and Reid entered into a stipulation dismissing the claims and counterclaims between them.

[2] PostX brought a summary adjudication motion regarding Counts I, III, and V on the ground that the "intracorporate conspiracy doctrine" bars the two antitrust conspiracy claims against PostX and the Mayfield Funds. The Court addresses this issue by separate order.

2

United States District Court

For the Northern District of California

John Ferraro and Vice President Rodger Kobayashi. Third Am. Compl. ¶¶ 36, 38. PostX alleges that information about customers and potential customers, as well as confidential information about business and personnel strategy, was proprietary to PostX, and that without it, Sigaba would not have known that some of these entities were using or seeking secure messaging products, who at these entities was responsible for making decisions about such products, and what their purchasing needs and methods were. Id. at ¶¶ 39-40.

In its counterclaims, Sigaba alleges that PostX initiated the patent suit for improper and anticompetitive purposes. Sigaba's Answer and Counterclaims ¶ 20. The factual predicate to this charge is as follows: In August 2000, officers of both companies met to explore business opportunities and entered into a Non-Disclosure Agreement. Id. at ¶ 14. After these discussions ended, PostX and Sigaba remained competitors in the market for "non-PKI-based Secure Document Delivery Systems," particularly for the business of Bank of America. Id. at ¶ 10, 16. On about August 28, 2002, Bank of America signed a contract to purchase Sigaba's secure document delivery system. Id. at ¶ 16.

According to Sigaba, PostX learned that it had lost the Bank of America contract to Sigaba and, on September 12, 2002, sent a fax to Bank of America informing the bank that it had filed a patent infringement suit against Sigaba. Id. at ¶ 18. PostX did not actually file the patent infringement suit until September 13, 2002. Id. at ¶ 19. At about the same time, PostX posted a press release on its website announcing the filing of the suit. Id. Sigaba alleges that, because of the 2000 meeting between the companies, PostX knew that Sigaba's products did not infringe the '688 patent, and in fact PostX's Chief Technology Officer admitted that the suit had no technical merit. Id. at ¶ 21-22. Sigaba claims that PostX's second patent infringement suit against Sigaba, filed after the '647 patent was issued to PostX in November 2002, is also sham litigation. Id. at ¶ 23. According to Sigaba's counterclaims, PostX conspired with counterdefendant the Mayfield Funds ("Mayfield") and attempted to monopolize the market for non-PKI-based Secure Document Delivery Systems. Id. at ¶¶ 10-11. The Mayfield Funds are the investment vehicles for a venture capital firm that invested in PostX multiple times since 1998 and has owned approximately 20% of PostX's stock during this time.

Now before the Court are four summary judgment motions filed by the parties: (1) Sigaba's motion for summary adjudication of PostX's unfair competition claim; (2) PostX's motion for summary adjudication of Noerr-Pennington immunity as to the antitrust and false advertising counterclaims; (3) PostX's motion for

summary adjudication of Sigaba's Sherman Act counterclaims (Counts I, II, and III); and (4) PostX's motion for summary adjudication of Sigaba's Fourth and Sixth counterclaims (the Lanham Act and common law unfair competition counterclaims).

**LEGAL STANDARD**

Summary judgment or adjudication is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

In a motion for summary judgment, "[if] the moving party for summary judgment meets its initial burden of identifying for the court those portions of the materials on file that it believes demonstrate the absence of any genuine issues of material fact, the burden of production then shifts so that the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial." See T.W. Elec. Service, Inc., v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 ( 9th Cir. 1987) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 317 (1986)). In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence, and draws all inferences in the light most favorable to the non-moving party. See T.W. Electric, 809 F.2d at 630-31 (citing Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348 (1986)); Ting v. United States, 927 F.2d 1504, 1509 (9th Cir. 1991). The evidence presented by the parties must be admissible. Fed. R. Civ. P. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. Thornhill Publ'g Co., Inc. v. GTE Corp., 594 F.2d 730, 738 (9th Cir. 1979).

**DISCUSSION**

I.    **Sigaba's motion for summary adjudication of PostX's common law unfair competition claim**

Sigaba contends that it is entitled to summary adjudication because PostX cannot show that Sigaba used any information provided by James Reid to win an account with Fidelity bank. As a threshold matter, the parties dispute whether PostX has alleged damages from unfair competition for a single customer – Fidelity –

United States District Court

For the Northern District of California

or whether it may also seek unfair competition damages unrelated to this account.  In its responses to Sigaba's interrogatories regarding the unfair competition claim, PostX stated:

> As a result of the information provided to it by Reid, Sigaba learned what First Union's secure development delivery needs were, who at First Union was in favor of the PostX solution and who was against it, and who was involved in negotiating contracts on behalf of First Union and used this information to solicit First Union as a customer . . . Additionally, Sigaba used the information it obtained from Reid in order to interfere with PostX's contractual relationships with Schwab and DST.

Fisher Decl., Ex. F at 4:9-16.

PostX responded to the interrogatory regarding the damages it suffered as a result of Sigaba's alleged unfair competition by stating: "PostX's damages include lost customers opportunities, which include, at a minimum, the Fidelity account." Id. at 7:24-25.  According to Sigaba, these statements limit PostX's claim for damages to the Fidelity account, and this account is the only one discussed in the report of Michael Wagner, PostX's damages expert.  As PostX points out, the Wagner report is not limited in this way, but rather specifies two categories of damages: (1) $1,514,447 from the lost Fidelity account, and (2) the $487,644 "opportunity cost" of an additional 1,400 hours PostX spent servicing actual and potential clients.  The Court concludes that PostX's alleged unfair competition damages include both of these figures.

Sigaba contends that PostX cannot prove that Sigaba won the Fidelity account because of the information provided by Reid.  According to Sigaba, its relationship with Fidelity predated any contact between Reid and Sigaba, and PostX lacks any evidence that Sigaba actually used information provided by Reid to interfere with PostX's customers.  In addition, Sigaba contends that, even if it obtained and used confidential information from Reid about the "technical deficiencies" in PostX's technology, specifically, the use of "out-of-band passwords" and 8-bit encryption, this conduct does not constitute the tort of unfair competition.

It is possible that the "technical deficiencies" allegedly pointed out by Sigaba representatives to prospective PostX customers would not, in isolation, give rise to an unfair competition claim.  Sigaba distinguishes this allegation from the leading unfair competition cases, United States Golf Ass'n v. Arroyo Software Corp., 69 Cal. App. 4th 607 (1999), and City Solutions v. Clear Channel Communications, Inc., 365 F.3d 835 (9th Cir. 2004), which did not involve a comparison between one's own product and a competitor's.  To establish unfair competition under California law, a plaintiff must show: (1) that the plaintiff invested substantial time, skill or money in developing its property; (2) that the defendant appropriated and used

5

United States District Court

For the Northern District of California

1    this property at little or no cost; (3) that the defendant's appropriation and use of the property was without the

2    plaintiff's authorization or consent; and (4) injury.  <u>City Solutions, Inc.</u>, 365 F.3d at 842.  The Court agrees

3    that this allegation cannot, on its own, form the basis for PostX's unfair competition claim, in part because it

4    is difficult to see how pointing out the differences between two products is an appropriation or use of the

5    plaintiff's confidential information.

6          Nonetheless, the Court finds that PostX has raised a triable issue of fact on the unfair competition claim

7    based on circumstantial evidence.  PostX's claim rests on alleged disclosures made by James Reid of PostX's

8    confidential information to Sigaba after he left PostX on April 4, 2002.  Reid was terminated from PostX and

9    signed a Separation Agreement stating that he would keep confidential "all information [he] received while

10    employed by Company concerning Company's products and procedures, the identities of Company

11    customer's, Company's sales, Company's prices, the terms of any of Company's contracts with third parties,

12    and the like." Ullman Decl., Ex. C.[3]  In a declaration submitted in this case on March 25, 2003, Reid disclosed

13    that he had met with Sigaba representatives after he left PostX.  In a June 11, 2002 email to Stanley Chin, a

14    Sigaba consultant, Reid provided a list of PostX customers with whom he had interacted, including Schwab,

15    Fidelty, First Union, Morgan Stanley, Bank of America, Wells Fargo, Prudential, Aetna, DST, and Ceridian.

16    Bell Decl., Ex. A.  Chin sent this list to Sigaba's President and CFO the next day, with the message: "Roger

17    fyi John, you and I should get together on this!"  <u>Id.</u>  PostX also points to a memo written by Sigaba's

18    Chairman and CEO Robert Cook, describing a discussion with Reid on approximately June 14, 2002: "Heard

19    from Jim Reid that Mike Seychols, the CEO of PostX got blown out by the board and they had big layoffs.

20    It is time to kick them to death, now that they are down.  Need to get to DST, Metavanta, ACI, and the whole

21    bunch." Bell Decl., Ex. B.  According to another email, a Sigaba consultant stated that he had tried to reach

22    Reid, and John Ferraro of Sigaba replied, "If you get him ask him how many total customers PostX has." <u>Id.</u>

23    at Ex. C.  PostX contends that Reid began consulting with Robert Cook on a regular basis, beginning on May

24    5, 2002, and ultimately met with Sigaba executives and consultants.  Fisher Decl. ¶ 5, Ex. E.

25          Viewing this evidence in the light most favorable to PostX, as the Court must in deciding this motion,

26    it is clear that there is more than a scintilla of evidence that Reid provided confidential information to Sigaba and

27

28          [3] Reid was also bound by a Non-Disclosure Agreement with PostX.  <u>See</u> Ullman Decl., Ex. A.

that Sigaba used it to interfere with PostX's customer relationships.  The alleged confidential information includes information about PostX's operations, marketing, product and sales strategy, management strategy, and personnel decisions.  Fisher Decl., Ex. F. 7:24-25. While the customer list contained in the June 11, 2002 Chin email does not itself constitute this proprietary material, the trail of emails creates a triable issue on whether Reid provided confidential PostX information that Sigaba used to its competitive advantage.  In addition, PostX raises questions about the credibility of Sigaba witnesses Reid, Chin, Cook, and Ferraro, who gave conflicting and somewhat curious descriptions of their contacts with Reid.  Considering the evidence in the appropriate light, these credibility issues are for the jury.[4]

Accordingly, summary adjudication is DENIED as to this claim.

**II.     PostX's motion for summary adjudication of Noerr-Pennington immunity on Sigaba's antitrust and false advertising counterclaims**

PostX seeks summary adjudication of Sigaba's antitrust and false advertising counterclaims on grounds that the patent infringement and trade secret misappropriation claims brought by PostX did not constitute "sham litigation," and therefore PostX is entitled to immunity under the Noerr-Pennington doctrine.  This motion applies to Count I (for restraint of trade under Sherman Act § 1 against PostX and Mayfield); Count II (for attempted monopolization under Sherman Act § 2 against PostX); Count III (for conspiracy to attempt monopolization under Sherman Act § 2 against PostX and Mayfield); and Count IV (for false and misleading advertising under the Lanham Act, against PostX).[5]

The Noerr-Pennington doctrine protects from antitrust liability those who petition the government in order to secure or amend their rights.  See Eastern Railroad Presidents Conference v. Noerr Motor Freight,

---

[4] Sigaba offers evidence to refute the statement by PostX CTO Cayce Ullman that, before May 2002, PostX had "rarely observed Sigaba to be actively competing for the same customers as PostX." Ullman Decl. ¶ 6.  Specifically, Sigaba cites documents and testimony from Ullman's deposition demonstrating that PostX executives, including Ullman, considered Sigaba a close competitor long before May 2002.  It is well-settled that a party cannot create an issue of fact by submitting a declaration that conflicts with his own prior testimony. Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262, 266 (9th Cir. 1991).  The Court agrees that this portion of Ullman's declaration does not create a fact issue; however, it finds that there are other triable issues precluding summary judgment.

[5] The Court's grant of PostX's motion for summary judgment of Counts I and III, based on the intracorporate conspiracy doctrine, renders this motion partially moot.  However, the Court must consider the Noerr-Pennington issue with respect to Count II and the Lanham Act claim.

**United States District Court**
For the Northern District of California

1   Inc., 365 U. S. 127 (1961); United Mine Workers of America v. Pennington, 381 U.S. 657 (1965). This right

2   includes litigation, see California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508 (1972), but does

3   not include "sham" or baseless litigation. The issue before the Court is whether PostX's patent and trade

4   secrets misappropriation claims were sham litigation within the meaning of Professional Real Estate Investors,

5   Inc. v. Columbia Pictures Industries, Inc., 508 U.S. 49, 60 (1993) ("PREI").

6          In PREI, the Supreme Court provided a two-part definition of sham litigation:

7          First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could
           realistically expect success on the merits. If an objective litigant could conclude that the suit

8          is reasonably calculated to elicit a favorable outcome, the suit is immunized under Noerr, and
           an antitrust claim premised on the sham exception must fail. Only if a challenged litigation is

9          objectively meritless may a court examine the litigant's subjective motivations. Under this
           second part of our definition of sham, the court should focus on whether the baseless lawsuit

10         conceals "an attempt to interfere directly with the business relationships of a competitor, . . .
           through the use [of] the governmental process, – as opposed to the outcome of that process

11         – as an anticompetitive weapon.

12   PREI, 508 U.S. at 60 (citations omitted, emphasis original).

13   For the "objectively baseless" prong, the Supreme Court borrowed the "notion of probable cause, as

14   understood and applied in the common-law tort of wrongful civil proceedings," and held that "the existence of

15   probable cause to institute legal proceedings precludes a finding that an antitrust defendant has engaged in sham

16   litigation." Id. at 62. Probable cause "requires no more than a reasonable belief that there is a chance that [a]

17   claim may be held valid upon adjudication." Id. (citations omitted). Thus, a finding that an antitrust defendant

18   had probable cause to sue entitles that defendant to Noerr-Pennington immunity.[6]

19         In the patent infringement context, the probable cause inquiry is whether a reasonable litigant could

20   believe that there was a chance of prevailing on a claim that an accused product (here, Sigaba's SendAnywhere

21   configuration) met the limitations of the patent. This analysis must consider objective reasonableness in light

22   of the infringement plaintiff's knowledge at the time the suit was instituted, but may not consider the plaintiff's

23   intent. Sheldon Appel Co. v. Albert & Oliker, 47 Cal. 3d 863, 881 (1989). The Court is mindful that, under

24   PREI, Sigaba must first show that there was no objective merit to the suit when it was filed before the

25

26   ────────────────

27         [6] The Supreme Court cautioned that, "[o]f course, even a plaintiff who defeats the defendant's claim
     to Noerr immunity by demonstrating both the objective and subjective components of a sham must still prove

28   a substantial antitrust violation. Proof of a sham merely deprives the defendant of immunity; it does not relieve
     the plaintiff of the obligation to establish all other elements of his claim." Id. at 60.

United States District Court

For the Northern District of California

1    subjective intent of individual PostX representatives becomes an issue.[7]

2

3         **A.    Patent infringement claims**

4         Sigaba contends that summary judgment is precluded by (1) a "battle of the experts" offered by each

5    party on the issue of probable cause; (2) the admission by Cayce Ullman, PostX's CTO, that the lawsuit was

6    without technical merit, and (3) PostX's failure to conduct an adequate pre-filing evaluation.

7

8         **1.    Expert opinions**

9         Sigaba contends that there is a "classic 'battle of the experts'" on the issue of whether, at the time the

10   lawsuits were filed, no reasonable litigant would have believed that there was a realistic chance that Sigaba's

11   product infringed the '688 and '647 patents.  In support of its motion, PostX submits declarations from patent

12   lawyer Larry Nixon and PostX CEO Thampy Thomas, opining that a reasonable litigant would have probable

13   cause to believe that the '688 patent was infringed because there was an objective basis for believing that the

14   Court would adopt PostX's claim constructions, and for believing that the Court might find infringement under

15   the doctrine of equivalents.  In support of its opposition, Sigaba submits the expert reports of lawyers Roger

16   L. Cook, and Dennis R. Suplee, which were disclosed on March 4, 2005.[8]  According to Sigaba, its experts

17

18        [7] Sigaba also argues that, under the Ninth Circuit's holding in <u>USS-POSCO Indus. v. Contra Costa
19   County Bldg. & Constr. Trades Council</u>, 31 F. 3d 800, 811 (9th Cir. 1994), the objective prong of <u>PREI</u> does
     not apply and instead the Court should apply <u>Cal. Motor Transp. Co. v. Trucking Unlimited</u>, 404 U.S. 508
20   (1972), where the Supreme Court held that litigation may be deemed a sham if a party files a series of lawsuits,
     in which case "the question is not whether any one of them has merit . . . but whether they are brought pursuant
21   to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market
     rival."  <u>USS-POSCO</u>, 31 F.3d at 810-811.  According to Sigaba, in addition to the two infringement suits
22   regarding the '688 and '647 patents, the Court should also consider PostX's two amendments to the complaint
     to add additional parties and claims as well as its later infringement contentions regarding two accused products
23   not mentioned in the original complaint.  <u>See</u> Def.'s Opp'n re: Antitrust Immun. at 23:18-24:7.  The Court finds
     that the two related lawsuits – including the amendments and additional infringement contentions – do not
24   constitute the "whole series of legal proceedings" anticipated by <u>USS-POSCO</u>, and therefore the <u>PREI</u> test
     is the appropriate one.

25        [8] PostX raises various objections to the Cook and Suplee reports. Specifically, it contends that Cook
26   and Suplee lack the skill in the area of secure messaging to offer construction of the patent claims; that Suplee
     is not even a patent attorney, and that he impermissibly relied on another patent attorney, Rob McKinley, who
27   drafted the expert report; and that Cook and Suplee did not apply the correct "probable cause" and
     "reasonable litigant" standards of <u>PREI</u>. Because the Court concludes that, even taking into account the Cook
28   and Suplee reports, PostX is entitled to summary judgment, it does not rule on these objections.
          In addition, PostX points out that, instead of submitting "reply" reports to Larry Nixon's April 8, 2005

**United States District Court**
For the Northern District of California

1   have concluded that a reasonable litigant in PostX's position at the time it filed the lawsuits could not have

2   expected a realistic chance of prevailing on the merits.  Sigaba also argues that Larry Nixon's declaration relies

3   heavily on the opinions of Thampy Thomas, a crucial fact witness of questionable credibility, and that PostX's

4   experts have impermissibly proffered claim construction arguments different from those advanced during prior

5   phases of this litigation.  PostX contends that these experts disagree primarily on claim construction, not on a

6   factual issue regarding what a reasonable litigant would have believed.  In addition, they disagree about whether

7   a reasonable litigant could have believed it had a realistic chance of prevailing on a doctrine of equivalents

8   theory.  Both issues, according to PostX, are matters of law to be decided by the Court, and do not preclude

9   summary judgment.

10

11

12                            **a.      Claim construction**

13          The Court agrees with PostX that the battle of the experts joined by the parties here does not create

14   a triable issue for a jury to decide.  Under <u>Markman v. Westview Instruments, Inc.</u>, 52 F.3d 967 (Fed. Cir.

15   1995) (en banc), <u>aff'd</u>, 517 U.S. 370 (1996), claim construction is an issue for the court, not the jury.   The

16   expert opinions all address whether a reasonable litigant could have believed that Sigaba's SendAnywhere

17   configuration met the claim limitations based on reasonable claim constructions.  <u>See</u> Suplee Report at 5-9;

18   Cook Report at 6-12; Nixon Report at 6-17.  For the '688 patent, they address the constructions of the

19   following terms, among others: (1) "**'a'** first computer"; (2) "opening said email **message**"; and (3) "initiate

20   **automatic** generation and transmission of the return receipt."   For the '647 patent, they address claim

21   construction of the terms: (1) "storing password data and trade details data in **a database**"; and (2) "encrypting

22   an electronic envelope and a trade confirmation document **based on** the trade details data and the password

23   data."

24   ────────────────

25   rebuttal report, Sigaba submitted new declarations by Cook and Suplee on June 20, 2005, in support of its
     opposition to this summary adjudication motion, and attached the expert reports to those declarations.  These
26   declarations contain opinions that the doctrine of equivalents does not apply, while the original Cook and
     Suplee reports did not address this issue, and thus PostX argues that the declarations amount to untimely and
27   prejudicial second rebuttal reports to which it has not had an adequate opportunity to respond.  The Court
     agrees, and hereby EXCLUDES the Cook and Suplee declarations.  It still considers the Cook and Suplee
28   expert reports themselves, which were properly disclosed.

United States District Court

For the Northern District of California

1    For the '688 patent, Sigaba and its experts state that: (1) PostX's construction of "a first computer"

2    as "one or more" computers was a futile interpretation because there was no single computer in the

3    SendAnywhere configuration that performed the three functions of transmitting an email message, transmitting

4    the executable software, and receiving a return receipt; (2) the proposed construction of "opening said email

5    message" as also opening an attachment to the email message was futile because the accused product required

6    double-clicking on an email attachment before the executable software would run, not just opening a

7    SendAnywhere email message; (3) SendAnywhere does not perform "automatic" generation and transmission

8    of a return receipt, as required by the claims, but rather requires the recipient to manually provide a username

9    and password; and (4) Sigaba's software does not "generate" a return receipt, as required by the claims and

10   indicated by the file wrapper for the '688 patent.  For the '647 patent, Cook and Suplee opine that: (1) PostX

11   again advanced the erroneous claim construction that "a database" where two types of data could be stored

12   referred to "one or more" separate databases, which is how the Sigaba software stores data; and (2) PostX

13   frivolously argued that Sigaba's products met the claim requirement that encryption be "based on" password

14   data even though Sigaba's products did not use password data for encryption.

15   While the Court did not adopt PostX's proposed constructions of various claim terms, it nonetheless

16   finds that there was probable cause for PostX to believe there was infringement based on its constructions.

17   In PREI, the Supreme Court specifically cautioned that, "when the antitrust defendant has lost the underlying

18   litigation, a court must resist the understandable temptation to engage in post hoc reasoning by concluding that

19   an ultimately unsuccessful action must have been unreasonable or without foundation." 508 U.S. at 61 n.5. The

20   Court agrees with PostX that Cook and Suplee base their analyses on the claim constructions adopted by the

21   Court at the end of the litigation, not on what constructions might have seemed reasonable at the time the suit

22   was filed.  For the '688 patent, the Court did not adopt PostX's proposed construction of "a first computer"

23   as "one or more" computers, but there are Federal Circuit cases construing "a" as both singular and plural, and

24   the Court cannot say that no reasonable litigant would have believed it could prevail on PostX's construction.

25   Compare Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc., 246 F.3d 1336, 1347 (Fed.

26   Cir. 2001), and KCJ Corp. v. Kinetic Concepts, Inc., 223 F.3d 1351, 1356 (Fed. Cir. 2000), with Abtox,

27   Inc. v. Exitron Corp., 122 F.3d 1019, 1023 (Fed. Cir. 1997).  The Court also found that there was no

28

infringement because the claim limitation of "opening said email message" referred only to opening an email itself, not also opening an attachment to the email, but the Court does not accept the brief and conclusory statements of Sigaba's experts that the Court's interpretation was the only reasonable one. See Suplee Report at 7; Cook Report at 9. PostX also proposed that generation of a return receipt could be "automatic" even if an individual must enter a password to generate the return receipt, and while the Court did not adopt this construction, it did not rely on this construction for its finding of non-infringement. PostX's expert Nixon also opines that, because claim 12 requires the executable software to "initiate automatic generation and transmission of said return receipt," it does not clearly require the software itself to generate the return receipt. With respect to the '647 patent, PostX argued that "a database" could mean "one or more databases," and while the Court did not adopt PostX's proposed construction, it was reasonable for the same reasons regarding "a first computer," discussed above.

The Court also observes that, in the patent infringement context, the PREI inquiry is complicated by the fact that it would be very difficult for any reasonable litigant to predict how a district court might construe the relevant claims and how a reviewing court might rule on the district court's claim construction. Moreover, if these expert opinions were presented to a jury, the jury would be deciding which claim construction arguments were "reasonable" and which were "futile" – undoubtedly a question of law intended for the Court. At oral argument, counsel for Sigaba pointed out that these considerations, taken to their logical extreme, would prevent virtually any finding of sham litigation in a patent case. This point is well-taken, and the Court agrees that plaintiffs should not feel free to file objectively baseless claims with impunity simply because of the complexity and unpredictability of patent litigation. Here, however, because the probable cause analysis rests on claim construction, and the Court finds that PostX's claims were not objectively baseless, this case is not an appropriate example of how sham patent litigation should be treated by the courts.

PostX's motion for summary adjudication on grounds of Noerr-Pennington immunity is GRANTED as to the antitrust claims.

### b.    Doctrine of equivalents

PostX expert Larry Nixon opines that a reasonable litigant would also have had probable cause to

believe that the SendAnywhere configuration infringed the '688 patent under the doctrine of equivalents. Through the declarations of Cook and Suplee, Sigaba contends that the Court cannot consider a doctrine of equivalents argument because PostX did not present it during the summary judgment phase of the case, and because the argument is precluded by prosecution history estoppel.

The Court has excluded the Cook and Suplee declarations on grounds that they constitute untimely and prejudicial second rebuttal expert reports. Therefore, it does not reach the merits of their doctrine of equivalents arguments or consider whether such arguments are precluded.[9] Nonetheless, the Court notes that, under PREI, PostX may advance infringement arguments not previously presented on summary judgment. PREI analysis requires an assessment of what a reasonable litigant would have believed on the basis of facts known to it. Sigaba cites no authority for the proposition that this reasonable litigant is bound by the positions it asserted when it filed the suit, and indeed such a constraint would be surprising in light of the objective nature of the probable cause standard and the fact that the existence of probable cause is measured at the time of filing, not at various later stages of the litigation.

### 2.    Admission of Cayce Ullman

According to Sigaba, PostX CTO Cayce Ullman made admissions to James Reid and Diana Rubalcaba that he "knew of no technically valid basis for the suit,"; that "there is no merit to the case," but "we're doing it"; and that the suit was "intended to slow the progress of Sigaba." See Fisher Decl., Ex. V at ¶ 3, Ex. U at ¶ 11. Sigaba argues that this evidence is independently sufficient to preclude summary judgment because no reasonable litigant who knows that his lawsuit lacks technical merit would expect a realistic chance of success. PostX contends that Ullman's alleged admissions reveal only his subjective beliefs about the likelihood of the lawsuit's success and do not factor into the objective analysis of what a reasonable litigant would have believed. The Court agrees with PostX, and finds that Ullman's statements do not preclude summary judgment.

---

[9] Whether prosecution history estoppel applies, and whether the doctrine of equivalents is available, are questions of law for the Court. Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd., 344 F.3d 1359, 1367-68 (Fed. Cir. 2003). Under the doctrine of prosecution history estoppel, a narrowing amendment made for a substantial reason related to patentability results in the surrender of all territory between the original claim limitation and the amended claim limitation. Id. at 1367.

**United States District Court**
For the Northern District of California

### 3.    Prefiling investigation

The parties also dispute the relevance of Rule 11's requirement of an adequate prefiling investigation to a finding of probable cause under PREI. Sigaba contends that PostX's haste in filing suit led it to conduct an inadequate investigation and that this violation of Rule 11 is sufficient grounds to deny summary judgment. According to Sigaba, the Supreme Court in PREI endorsed Rule 11 standards in assessing whether a lawsuit is objectively baseless. PostX argues that the conduct of an actual litigant in conducting a prefiling investigation is not relevant to the objective inquiry contemplated by the first prong of PREI. For the '647 patent, PostX contends that its pre-filing investigation fell within the "safe harbor" provided by Hoffman-La Roche, Inc. v. Invamed, Inc., 213 F.3d 1359 (Fed. Cir. 2000).

The PREI court made reference to the 1987 version of Federal Rule of Civil Procedure 11, then in effect, and stated that the action at issue in the case was arguably "warranted by existing law" or at the very least was based on an objectively "good faith argument for the extension, modification, or reversal of existing law." PREI, 508 U.S. at 65, citing Fed. R. Civ. P. 11. The PREI opinion neither references nor expressly adopts the Rule 11 requirement that an attorney must represent to the court that a filing is based on a "reasonable inquiry," and thus it does not appear that PostX's investigation is material to the PREI inquiry. Moreover, the details of PostX's prefiling investigation are not before the Court, in part because no Rule 11 motion has been made and PostX has claimed attorney-client privilege and work product protection, and therefore it is impossible for the Court to decide whether that investigation was indeed "inadequate."

With respect to the '647 patent, PostX admits that, at the time of filing the second infringement suit, it did not have sufficient information about Sigaba's products to conclude that there was infringement. See Cooper Decl., Ex. I at 7 (Response to Interrogatory No. 10: "Prior to filing, PostX reviewed Sigaba's website and determined that Sigaba had begun offering an application for trade confirmation. PostX then wrote to Sigaba requesting information regarding how Sigaba's trade confirmation product worked. Sigaba refused to provided any information by which infringement, or non-infringement, could be determined."). PostX also had the patent reviewed by an expert, who concluded that further technical information would be required for a full infringement analysis. PostX argues that, under these circumstances, the "safe harbor" of Hoffman-La Roche

14

United States District Court

For the Northern District of California

applies.  In Hoffman-La Roche, the Federal Circuit affirmed a district court's denial of Rule 11 sanctions where the plaintiff requested technical information from the defendant, which the defendant refused to provide, and the plaintiff then unsuccessfully attempted to reverse engineer the process for manufacturing defendant's product.  It then filed suit for infringement.  Once the defendant provided the requested information, the plaintiff dismissed the suit.  Here, PostX contends that it performed the same type of prefiling investigation as the plaintiff in Hoffman-La Roche, because it believed the '647 patent to be infringed, sought information that would confirm or deny its suspicions, and consulted experts regarding technical aspects of the patent.  Sigaba argues that PostX's conduct was entirely insufficient under this standard because it did not perform adequate infringement analysis or attempt to reverse engineer the product.

For the reasons stated above, the Court does not consider PostX's prefiling investigation material to the PREI analysis.  But even if it were, because the full details of PostX's investigation have not been presented, and because Sigaba's refusal to provide technical details of the product is substantially the reason for any deficiencies in the infringement analysis, PostX would likely be entitled to the Hoffman-La Roche safe harbor.

**B.**     **Trade secret misappropriation claim**

PostX also argues that its trade secret misappropriation claim, which it added to the complaint by amendment, was not objectively baseless because a reasonable litigant would have had probable cause to believe that Reid and Sigaba had misappropriated PostX trade secrets.  Specifically, PostX cites a declaration from Reid revealing that he had been consulting for Sigaba shortly after his termination from PostX in April 2002, the fact that Sigaba had begun appearing at PostX's prospective customers, and the June 11, 2002 Chin email as evidence that the probable cause standard has been met.

Sigaba does not separately address the trade secret misappropriation claim in its opposition and makes no evidentiary showing specific to that claim.  It states in a footnote: "PostX's subsequently-added trade secret misappropriation claims were also objectively baseless, for the reasons discussed in the expert report of Messrs. Suplee and Cook.  See Exhibit A to the supporting declarations of Messrs. Cook and Suplee, filed herewith."  Def.'s Opp'n re: Antitrust Immun. at 3 n. 3.  As PostX argues, this brief statement is insufficient to raise a genuine issue of material fact about whether the trade secret misappropriation claim was objectively

15

baseless.  In addition, the Court's grant of summary judgment on PostX's UTSA claim was based on a purely procedural ground: PostX's failure to adequately disclose its trade secrets in its § 2019(d) designation.  The adverse ruling on this claim certainly does not meet the <u>PREI</u> standard for objective baselessness.

Accordingly, PostX is also entitled to immunity with respect to this claim.  Because this claim was previously dismissed, PostX does not seek, and the Court does not grant, summary adjudication as to this claim.

**C.     Lanham Act claim**

PostX argues that <u>Noerr-Pennington</u> immunity also protects if against Sigaba's Fourth Counterclaim for violation of the Lanham Act.  Sigaba disputes this contention and argues that it may still have a viable Lanham Act claim even if the Court finds that the patent litigation was not a sham.  <u>See</u> Def.'s Opp'n re: Fourth and Sixth Counterclaims at 2 n. 1.  To establish a Lanham Act claim under Section 43(a), Sigaba must show: (1) a false statement of fact in a commercial advertisement about PostX's or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) PostX caused its false statement to enter interstate commerce; and (5) there has been or is likely to be injury, either by a direct diversion of sales or by a lessening of the goodwill associated with its products.  <u>Southland Sod Farms v. Stover Seed Co.</u>, 108 F.3d 1134, 1139 (9th Cir. 1997).  A party may assert a violation under section 43(a) of the Lanham Act for false infringement allegations.  In addition to the elements of a section 43(a) violation, such a claim also requires a showing of bad faith.  <u>Zenith Electronics Corp. v. Exzec, Inc.</u>, 182 F.3d 1340, 1353 (Fed. Cir. 1999) ("[t]his prerequisite is a function of the interaction between the Lanham Act and patent law, and is in addition to the elements required by § 43(a) itself.").  However, a Lanham Act claim based on a false claim of  infringement does not require a showing of objective baselessness, and thus the Court's finding that PostX's suit was not objectively baseless under <u>PREI</u> does not control the viability of Sigaba's Lanham Act counterclaim.

Summary adjudication based on <u>Noerr-Pennington</u> immunity is DENIED as to this claim.

16

United States District Court

For the Northern District of California

**III.**   **PostX's motion for summary adjudication of Sigaba's Sherman Act counterclaims**

This motion is rendered partially moot by the Court's ruling on PostX's prior motion for summary judgment of Counts I and III, the antitrust conspiracy counterclaims, which has been GRANTED for the reasons stated in the accompanying order. This motion is also rendered moot as to Count II by the Court's finding that PostX is entitled to Noerr-Pennington immunity, discussed in Part II, above.

Accordingly, the motion is DENIED as moot.

**IV.**   **PostX's motion for summary adjudication of Sigaba's Fourth and Sixth counterclaims (Lanham Act and common law unfair competition)**

**A.**   **Lanham Act claim**

PostX contends that it is entitled to summary adjudication on Sigaba's Lanham Act claim because Sigaba cannot establish damages for this claim. Sigaba seeks both damages and injunctive relief for its Lanham Act claim. The Ninth Circuit has held that a party need not prove injury when suing for injunctive relief under the Act, see Harper House, Inc. v. Thomas Nelson, Inc., 889 F.2d 197, 210 (9th Cir. 1987), and that "an inability to show actual damages does not alone preclude a recovery under section 1117." Lindy Pen Co. v. Bic Pen Corp., 982 F.2d 1400, 1411 (9th Cir. 1993). "[T]he preferred approach allows the district court in its discretion to fashion relief, including monetary relief, based on the totality of the circumstances." Southland Sod, supra, 108 F.3d at 1146, citing Lindy Pen, 982 F.2d at 1411. Particularly for claims of false advertising under section 43(a), a plaintiff may simply demonstrate falsity without a showing of consumer confusion or reaction. Id.; Lindy Pen, 982 F.2d at 1411.

In its Lanham Act claim, Sigaba alleges that PostX widely publicized its suit against Sigaba to potential customers, and that it went so far as to leave on its website a press release regarding the alleged infringement for months after the Federal Circuit had affirmed this Court's findings of non-infringement. In addition, it points to evidence of significant damages, including (1) testimony from Sigaba personnel about how the infringement suit "froze" the market and impacted customers' decisions, (2) testimony from customers about the effect of the litigation on their purchasing decisions, and (3) diversion of resources and loss of personnel because of the suit.

United States District Court

For the Northern District of California

1    PostX raises objections to some of this evidence, including hearsay objections to the statements of

2    Sigaba personnel regarding what various customers told them about the lawsuit's impact on their purchasing

3    decisions.  The Court finds that most of the statements by Sigaba personnel are inadmissible hearsay, and they

4    do not fall within the state of mind exception to the hearsay rule, as Sigaba contends.[10]

5        Despite this objectionable evidence, and although there is also proof that the litigation did not change

6    the ultimate purchasing decisions of these customers, the Court finds that a reasonable jury could find injury

7    based on the totality of the circumstances.  In a September 17, 2002 press release, PostX claimed that the

8    '688 patent "has been and continues to be infringed upon by Sigaba Secure Mail and Secure Statements

9    products, among others," and left this press release up on the website until March 2005, after the Federal

10   Circuit's affirmance of the Court's grant of summary judgment of noninfringement in November 2004.  Sigaba

11   identifies admissible evidence from third party customers suggesting that the lawsuit at least delayed or affected

12   some of their decisions.  For example, Nationwide decided "to not have Sigaba participate in any evaluation

13   until the legal issues are addressed," recognized that "the issue of the lawsuit was going to be a factor as it

14   related to a final decision of either one of these products," and sought an indemnification clause; and Bank of

15   America, which had just signed a contract with Sigaba, felt that the lawsuit "had an immediate impact," and

16   performed additional due diligence on Sigaba before ultimately awarding them the deal.  Fisher Decl., Exs. TT,

17   UU, VV.  There is also evidence of a diversion of resources at Sigaba – at least 5,000 hours spent by Sigaba

18   personnel – to the lawsuit.  See Decl. of Rodger K. Kobayashi ¶¶ 4-5.

19       Also weighing in the totality of the circumstances is the expert report of Dr. Frederick Warren-Boulton.

20   PostX contends that this report is limited to antitrust damages, and thus it cannot be considered in support of

21   the Lanham Act and unfair competition claims.  PostX has also submitted the 146-page Declaration of

22   Professors Portia I. Bass and Frank M. Bass, the creators of the "Bass diffusion model" used by Dr. Warren-

23   Boulton.  The Basses state that there are substantial mathematical differences between their model and Warren-

24

25       [10] For example, Sigaba offers double hearsay through the testimony of Jim Reid that, in a discussion
     with Kevin Glen of Putnam, he was told about "an individual – he wouldn't tell me who – from PostX had come
26   out and described in detail the nature of the lawsuit, what had happened so far and what they believed the
     outcome would be, and he said that that weighed in his decision as an element in his decision."  Fisher Decl.,
27   Ex. MM (J. Reid Depo.) at 553:9-16.  Robert Cook testified that he spoke to two people at CitiGroup, and
     "[t]hey said that the risk of going forward and having to rip everything out was an unacceptable risk."  Id. at
28   Ex. HH (R. Cook Depo.) at 215:16-216:8.

United States District Court

For the Northern District of California

1   Bolton's hypothesis, rendering the Warren-Boulton hypothesis a "radically different model," a new approach

2   that has not been tested for reliability, and "a contrivance that can be used to produce any desired forecast"

3   with "no basis in theory or in empirical testing." Bass Decl. at 16-18. Sigaba has moved to strike the Bass

4   declaration on grounds that it is an untimely and undisclosed expert report under Fed. R. Civ. P. 26(a)(2)(A).[11]

5   There is nothing in the Warren-Boulton report limiting it to Sherman Act damages alone, and indeed the expert

6   testified that his opinion was rendered regarding "anything that would involve damages." Fisher Decl., Ex. JJ

7   (Warren-Boulton Depo.) at 198:11. The Bass Declaration, while untimely as an expert report, is a highly

8   relevant document on the issue of damages. Because there is sufficient other evidence of Lanham Act injury,

9   the impact of the Bass Declaration on the admissibility of the Warren-Boulton report would be better addressed

10   through a <u>Daubert</u> motion than on summary judgment.

11   Because Sigaba has demonstrated a reasonable basis for damages under the Lanham Act, the Court

12   DENIES summary adjudication as to this claim.

13

14   **B.    Common law unfair competition claim**

15   In its Answer and Counterclaims, Sigaba stated: "Because the Court has indicated in its Order dated

16   June 28, 2004 that a cause of action for common law unfair competition may lie where an entity obtains and

17   uses information of its competitor, Sigaba now alleges such a claim against PostX out of an abundance of

18   caution." Answer and Counterclaims ¶ 74. PostX argues that summary judgment is proper because Sigaba

19   cannot establish any injury from Posts's alleged use of Sigaba's competitive information. In its interrogatory

20   responses regarding unfair competition damages, Sigaba referenced two prior interrogatories regarding the

21   particulars of the unfair competition claim, and then stated:

22       Sigaba's damages include lost customer opportunities, the time and effort responding to the
         disclosures relating to the baseless patent infringement lawsuits and misuse of confidential

23       Sigaba information, the costs, time and legal expenses associated with defending itself against
         PostX's baseless patent infringement lawsuits and the indemnification of Sigaba's potential and

24       actual customers and partners, and the effort in repairing relations with these entities. In
         addition to the categories of damages identified above, Sigaba's damages also include

25       competitive injury, compensatory damages and the value of the commercial advantage or

26

27       [11] Sigaba's initial expert report, which relied on the Bass model, was disclosed to PostX on March 4,
     2005. Rebuttal reports were due April 15, 2005. PostX did not submit the Bass declaration until it filed its

28   reply brief in support of this summary judgment motion on July 5, 2005.

1

2

benefit conferred upon PostX as a result of the disclosure of Sigaba's valuable customer information and business-related data to PostX. Sigaba will present expert testimony regarding the value of these damages at trial.

3  Townsend Decl., Ex. S at 8-9.

4  According to PostX, Sigaba never disclosed an unfair competition expert or report, despite a further

5  representation that, if PostX's unfair competition claim survived summary judgment, unfair competition damages

6  would "be the subject of a rebuttal expert report submitted by Sigaba at the appropriate time." Id. at Ex. U.

7  PostX contends that Sigaba has failed to make any showing on an essential element of this claim, and therefore

8  summary judgment is proper.

9       Sigaba's unfair competition claim rests primarily on a "competitive evaluation" of Sigaba that included

10  confidential information – specifically, the fact that Sigaba had no institutional investors, which Thampy Thomas

11  learned from one of Sigaba's founders – as well as non-confidential false information about Sigaba's technology

12  and the patent infringement suit. Sigaba alleges that PostX circulated this evaluation in the marketplace to

13  discourage customers from doing business with Sigaba. Sigaba also alleges that PostX representatives

14  attempted to learn further sensitive information from Sigaba's European distributor, but there is no evidence

15  that these attempts were actually successful.

16       While Sigaba's unfair competition claim seems factually weak, PostX's motion is largely based on its

17  objection to the lack of a separate expert report on unfair competition damages, and to infirmities in the

18  Warren-Boulton report itself. As discussed above, the admissibility of the Warren-Boulton report is not

19  properly before the Court at this time, and would more appropriately be treated through a pretrial Daubert

20  motion. That report is not limited to Sherman Act damages, but instead considers damage in the form of lost

21  customers and future profits, increased costs to Sigaba, diversion of resources to defend the lawsuit, diminution

22  in Sigaba's market worth, and litigation costs. Viewing the evidence in the light most favorable to Sigaba, the

23  Court concludes that it has made a sufficient showing of injury from the alleged unfair competition.

24       Accordingly, this motion is DENIED.

25

26

27

28

**CONCLUSION**

For the foregoing reasons and for good cause shown, the Court hereby DENIES Sigaba's motion regarding PostX's unfair competition claim; GRANTS PostX's motion regarding antitrust immunity as to the antitrust claims but DENIES it as to the Lanham Act claim; DENIES AS MOOT PostX's motion regarding Sigaba's Sherman Act counterclaims; and DENIES PostX's motion regarding Sigaba's Lanham Act and unfair competition counterclaims. [Docket #s 596, 617, 651, 659]

**IT IS SO ORDERED.**

Dated: August 16, 2005

_____
SUSAN ILLSTON
United States District Judge

United States District Court
For the Northern District of California

21